FILED

MAY 1 7 2012

CLERK

CIVIL NO. _12 - 4092_

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
(SOUTH DAKOTA) DIVISION

UNITED STATES OF AMERICA,
RESPONDENT,

-VS-
GUILLERMO ORTIZ,
MOVANT.

**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. § 2255**
Case No. 4:10-CR-40047-JBJ-1

**MEMORANDUM IN SUPPORT OF
28 U.S.C. § 2255**

Guillermo Ortiz
10757-173
FCI-MEDIUM
Post Office Box 4050
Pollock, Louisiana
71467-4050

**Pro se litigant**

## TABLE OF CONTENTS

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 - 6

ARGUMENTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7 -24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

FOOTNOTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 - 26

## TABLE OF AUTHORITIES CITED

**CASES**                                                          **PAGE NUMBER**

Iannelli, 420 U.S. 770 at 773 n. 5., . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Bland, 653 F.2d 989(1981, CA5 LA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Fraser, 243 F.3d 473(8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Rivera-Ruiz, 244 F.3d 263(1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Gebardi v. United States, 287 U.S. 112, 121(1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States v. Garcia 89 F.3d 362(7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Clark, 475 F.2d at 248 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Jewell, 532 F.2d 697, 698(9th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Brawner, 153 U.S. App. D.C. 1, 471 F.2d 969(1972) . . . . . . . . . . . . . . . . . . 15

United States v. Valerio, 48 F.3d 58(1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Polk, 56 F.3d 613(5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

United States v. Hunt, 129 F.3d 739(5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

United States v. Bryce, 208 F.3d 346(2nd Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

DePierre v. United States, 09-1533(June 9, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

United States v. Jackson, 968 F.2d 158, 162(2nd Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Bousley v. United States, 523 U.S. 614, 626(1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Blanchard, 542 F.3d 1133, 1143(7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Mitov, 460 F.3d 901, 906(7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Stirone v. United States, 361 U.S. 212, 215-16(1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Ratliff-White, 493 F.3d 812, 819(7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Baker, 227 F.3d at 960 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. Williams, 876 F.2d 1521, 1525(11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 24

**STATUTES AND RULES**                                      **PAGE NUMBER**

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 14, 18, 25

21 U.S.C. § 841(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11, 13

21 U.S.C. § 844 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

18 USCS § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**OTHER**

1 R. Anderson, Wharton's Criminal Law, and Procedure § 89, at 191 (1957)) . . . . . . . . . . . . 7, 9

U.S.S.G. § 2D2.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S. Sentencing Guidelines Manual 4B1.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
(SOUTH DAKOTA) DIVISION

UNITED STATES OF AMERICA,
        RESPONDENT,

-VS-                                CRIMINAL NO. 4:10-cr-40047-JBJ-1
                                        CIVIL NO.

GUILLERMO ORTIZ,
        MOVANT.

## MEMORANDUM IN SUPPORT OF 28 U.S.C. § 2255

COMES NOW the Movant Guillermo Ortiz pro se and moves this court to vacate, set aside, and/or correct the conviction and sentence in this case. In support of this motion, the Movant states the following:

**ISSUES PRESENTED FOR REVIEW:**

**ISSUE ONE:**

> **COUNSEL WAS INEFFECTIVE FOR NOT ARGUING THE WHARTON RULE.**

**ISSUE TWO:**

> **COUNSEL WAS INEFFECTIVE FOR NOT SHOWING THE DIFFERENCE BETWEEN "CONSPIRACY TO POSSESS" AND "CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE" A CONTROLLED SUBSTANCE.**

**ISSUE THREE:**

> **THE COURT GAVE THE JURY AN INAPPROPRIATE ANTI-DEADLOCK CHARGE WHEN IT INSTRUCTED THE JURY IT COULD ONLY ACQUIT OR FIND GUILT IF IT SPLIT ON ISSUES REGARDING MULTIPLE, OR SEPARATE CONSPIRACIES**

**ISSUE FOUR:**

> **COUNSEL WAS INEFFECTIVE FOR NOT ARGUING THAT THE "INTENT" WAS NOT SHOWN REGARDING PETITIONER'S "POSSESSION" OF THE CONTROLLED SUBSTANCE.**

**ISSUE FIVE:**

> **COUNSEL WAS INEFFECTIVE FOR NOT ARGUING FOR A BUYER/SELLER JURY INSTRUCTION**

**ISSUE SIX:**

> **SCIENTIFIC PROOF THAT THE SUBSTANCE ALLEGED AT TRIAL WAS A CONTROLLED SUBSTANCE TRIGGERING THE PROVISION OF THE STATUTE WAS NEVER PRESENTED TO THE JURY TO SUPPORT THE JURORS FINDING OF GUILT**

**BACKGROUND:**

Ortiz was arrested in January 2006 after Sioux Falls, South Dakota law-enforcement personnel ascertained his involvement in a controlled methamphetamine purchase. An ensuing search of Ortiz's home revealed a pipe and digital scale that both tested positive for the presence of methamphetamine, as well as a set of sales ledgers. The ledgers and corroborating testimony indicated that Ortiz was providing methamphetamine to various individuals for resale.

Ortiz was employed at the Triple R concrete paving company during 2005, and Dustin Call testified he met Ortiz during their employment during 2005. Ortiz adamantly denies this and holds that he did not meet Call until 2007 although it was at the Triple R paving company and employment records will reflect such. Call alleged that he was fronted at least fourteen grams of methamphetamine for resale during the year of 2005 from Ortiz. However, this would be a legal impossibility since Call did not meet Ortiz until 2007. Based on the foregoing Call was committing perjury when he testified under oath to events in 2005. After his January 2006

5

arrest, Ortiz pled guilty in state court to possession with intent to distribute a controlled substance and was incarcerated form August 2006 until August 2007. While incarcerated, he met Juan Maldonado. Maldonado testified that, while imprisoned, the two men discussed their respective histories of involvement with methamphetamine. Maldonado was released from prison briefly in 2007, returned after a parole violation, and was released again in the summer of 2008.

Maldonado testified that he contacted Ortiz in the late spring of 2009, hoping to expand his methamphetamine sales, and Ortiz introduced him to a distributor, Troy Rubin. Rubin testified that Ortiz distributed more than 4,000 grams of methamphetamine in 2009 and that Ortiz and Rubin fronted Maldonado a total of four pounds of methamphetamine during the summer of 2009.

In addition, Ortiz returned to his former concrete paving job in 2009, and his co-worker Call testified that he and Ortiz renewed their "relationship." Ortiz was arrested in April 2010. In May 2010, a grand jury indicted Ortiz on a single count of conspiring to distribute 500 grams or more of methamphetamine. Apart from Call, the Government's evidence at trial did not suggest that any of the identified participants were involved with Ortiz during the 2005 time frame, and if fact suggested strongly that, the issues of 2009-2010 were unrelated.

The district court included a jury instruction directing the jury to acquit Ortiz if it found that the evidence showed only multiple, separate conspiracies between Ortiz and Call, Ortiz and others identified in 2005, and Ortiz and others identified in 2009-2010. The jury returned a verdict of guilty, and the district court sentenced Ortiz to 188 months' imprisonment.

Ortiz appealed the jury finding to the Eighth Circuit Court of Appeal in case no. 11-1598, and on January 27, 2012, the Eighth Circuit "Affirmed" the ruling of the district court in a Per Curiam decision. Ortiz failed to timely file for Writ of Certiorari to the Supreme Court.

**ARGUMENT:**

**ISSUE ONE:**

**COUNSEL WAS INEFFECTIVE FOR NOT ARGUING THE WHARTON RULE.**

As defined by Wharton's treatise, Wharton's rule provides that: "An agreement by two persons to commit a particular crime cannot be prosecuted as a conspiracy when the crime is of such a nature as to necessarily require the participation of two persons for its commission." 1 R. Anderson, Wharton's Criminal Law and Procedure § 89, at 191 (1957); see also Iannelli, 420 U.S. 770 at 773 n. 5., showing this rule has been applied by numerous courts, state and federal alike.

It is clear that any possession with intent charge requires both a buyer and a seller. One cannot "*possess*" with "*Intent*" to distribute if there cannot be shown that "*Someone*" intended to "*Purchase*." In looking to the 2005 issues that lead to the continuing conspiracy charge it becomes questionable if the parties involved were ever in a conspiracy. We first consider Jose Rodriguez Narez. Narez testified that he and Ortiz are "childhood" friends from the same hometown in Mexico. Narez testified that he and Ortiz's sold methamphetamine for about "Two Months" from October thru December 5, 2005.

Narez never indicated that the sales were between anybody other than the two childhood friends, which means only two people, were involved in the transactions. Even if the Government argues otherwise, it is clear there is no evidence of an "On-Going Conspiracy" that

involves Narez. Because lenity always allows for consideration in favor of defendant, the lack of any link involved in the ongoing conspiracy theory between Ortiz and Narez falls squarely within the Wharton rule.

Next, we have Carlos Perez Pantaleon. Pantaleon testified that he and Ortiz were involved in methamphetamine together from sometime in 2005 until they were both arrested in January 2006. Pantaleon testified that he did not know any of the individuals involved in the alleged conspiracy, which began in approximately 2009. Because a conspiracy requires "Proof Beyond A Reasonable Doubt" that accused "KNEW" of it, **and with that** "KNOWLEDGE VOLUNTARILY" became part of it, Bland, 653 F.2d 989(1981, CA5 LA); it becomes clear that Pantaleon testimony excludes evidence of an essential element of a conspiracy strongly indicating a buyer/seller relationship.

We now come to Renee Ronsberg. Ms. Ronsberg testified that she used drugs with Pantaleon, Narez, and Ortiz.(Tr. 148 n. 13-25). Ortiz can think of no case law where a Conspiracy charged, "Use" as an element of the offense, an issue of first impression. In addition, Ms. Ronsberg also did not have any dealings or contact with any of the alleged conspiracy persons, which began in approximately 2009. In United States v. Fraser, 243 F.3d 473(8th Cir. 2001); a panel of this Circuit established that "drugs for personal-use cannot be consider at sentencing for determination of a Guideline range." Id at 475-76.

Because an essential element of conspiracy is an <u>agreement</u> to accomplish a common scheme or plan, and Ms. Ronsberg testified that although she was arrested after selling Meth she had 'received' from Ortiz. Her testimony was her relationship with Ortiz was one of 'usage.' A single drug transaction for personal use of purchaser, without pre-arrangement or other factors

8

indicative of conspiratorial intent, does not establish conspiracy under 21 U.S.C. § 841(a)(1) and 846. United States v. Rivera-Ruiz, 244 F.3d 263(1st Cir. 2001). Based on Ms. Ronsberg testimony there is no evidence of a conspiracy involving her, Ortiz, and "Others."

The last person involved in the 2005 issues was Dustin Call. Call testified that he was in a buyer/seller relationship with Carlos Pantaleon in 2005.(Tr. rec. 176 n. 15-19). Call also testified that he established a buyer/seller relationship with Ortiz in 2005 when Pantaleon was out of drugs.(Tr. Rec. 178 n. 03-09). To the point of Ortiz argument, Call like the others never acknowledged no conceded that a conspiracy existed between Pantaleon, Himself, and Ortiz in 2005.

One critical aspect of Call's testimony is that Call acknowledged that he would only "purchase" from Ortiz when Pantaleon was "Out." Under 21 U.S.C. § 846, an essential element of drug conspiracy is an agreement by two or more persons to violate narcotics laws. The number Two (2) in the conspiracy statute implies that two persons involved in a buyer/seller relationship can be charged with conspiracy without violation of the Wharton Rule having no additional proof of a third party. However, the Wharton Rule makes clear that this cannot be the effect of the 846-conspiracy charge. The Wharton Rule only becomes inapplicable when the "third-party" exception applies. The third party exception applies when "the conspiracy involves the cooperation of a greater number of persons than is required for commission of the substantive offense." Iannelli supra at 775(citing Gebardi v. United States, 287 U.S. 112, 121(1932)). As the Supreme Court explained:

> "While the two persons who commit adultery cannot normally be prosecuted both for that offense and for conspiracy to commit it, the third-party exception would permit the conspiracy charge where a 'matchmaker'-the-third-party-had conspired with the principals to encourage commission of the substantive offense."

Because prosecution for conspiracy to possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841 and 846 cannot constitute conspiracy between buyer and seller without third party involvement, lack of evidence of third party is lack of evidence of conspiracy. See Cf United States v. Garcia 89 F.3d 362(7th Cir. 1996)(In prosecution for conspiracy to possess with intent to distribute cocaine, in violation of 21 USCS §§ 841 and 846 and 18 USCS § 2, although defendant's attempted purchase of cocaine in and of itself could not constitute conspiracy between defendant and seller, defendant's agreement with co-conspirator to purchase drugs from seller for distribution by co-conspirator did constitute conspiracy).

In Ortiz case no evidence of any kind was presented to show anything other than a buyer/seller relationship existed to warrant the conspiracy charge therefore the conspiracy charge regarding issues related to the 2005 conspiracy are without merit and counsel was ineffective for not presenting the Wharton Rule to defeat the continuing criminal conspiracy.

**ISSUE TWO:**

**COUNSEL WAS INEFFECTIVE FOR NOT SHOWING THE DIFFERENCE BETWEEN "CONSPIRACY TO POSSESS" AND "CONSPIRACY TO POSSESS WITH INTENT TO DISTRIBUTE" A CONTROLLED SUBSTANCE.**

In order to be convicted of conspiracy under 21 USCS § 846 there must be proof beyond reasonable doubt that conspiracy existed, that accused knew of it, and with that knowledge, voluntarily became part of it; moreover, conspiracy to commit particular substantive offense cannot exist without at least that degree of criminal intent necessary for substantive offense itself.

10

There is a major difference between conspiracy to possess with intent to distribute and conspiracy to possess a controlled substance. The former is a violation of section 846, which can carry a maximum term of imprisonment of Life, while the latter is a violation of section 844, which carries a maximum term of 2-years. It is clear two or more people can agree to "purchase" a controlled substance and such "agreements" arguably meet the conspiracy theory.

The majority of the testimony regarding the 2005 conspiracy issues related to user agreements. Person one agreed to purchase from person two so that both one and two could get high. There was evidence of single sales by persons known by others but as earlier established a single sale for personal use of purchaser does not establish conspiracy and mere presence or association alone are not sufficient to prove participation in conspiracy.

The Government used a conspiracy theory to establish that one could define the possession of a controlled substance as a conspiracy to distribute a controlled substance based on the fact that personal use of purchaser was being supported by a single sale, which resulted in multiple sales by another. The government never made any connection between the single sale and the multiple sales or the parties making the multiple sales to the person who made the single sale.

Because the evidence presented in Ortiz case reflects a non-conspiracy theory in that the parties involved discuss personal use of a substance and past events that lead to incarceration. It becomes difficult to understand how counsel for Ortiz did not see the Government was presenting personal use possession issues under a conspiracy theory, creating a "Conspiracy to Possess" statute violation under 846. Because 846 "REQUIRE INTENT to DISTRIBUTE,"

counsel was clearly ineffective for not addressing the lack of essential elements being proven in the charged offense.

**ISSUE THREE:**

**THE COURT GAVE THE JURY AN INAPPROPRIATE ANTI-DEADLOCK CHARGE WHEN IT INSTRUCTED THE JURY IT COULD ONLY ACQUIT OR FIND GUILT IF IT SPLIT ON ISSUES REGARDING MULTIPLE, OR SEPARATE CONSPIRACIES**

During the jury instructions, the court stated in Instruction 21 at (3*) The government must convince you beyond a reasonable doubt that the defendant was a member of the single conspiracy charged in the Indictment. If the government fails to prove this as to the defendant, then you must find the defendant not guilty of the conspiracy charge, even if you find that he was a member of some other conspiracy. Proof that the defendant was a member of some other conspiracy is not enough to convict.*
(4)     *But proof that the defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict, if the government also proved that he was a member of the conspiracy charge in the Indictment.*

The court created an anti-deadlock instruction by the shear language of the instruction. The indictment charges that the defendant was a member of one single conspiracy to commit the crime of distributing 500 grams or more of a mixture and substance containing methamphetamine.

One of the issues the jury was to decide is whether there were really two or more separate conspiracies -- **one** between Ortiz, Panteleon, Narez and Ronsberg to commit the crime of conspiracy to distribute methamphetamine, and -- **one** between Ortiz, and Call to commit the crime of conspiracy to distribute methamphetamine, and -- **another** between Ortiz, Maldonado, Rubin, Bryan, Sandquist, Dale, and Reiners to commit the crime of conspiracy to distribute methamphetamine.

The jury could find that either of the conspiracies supported a single conspiracy theory of 500 grams or more of a mixture and substance containing methamphetamine for finding of guilt or that none of the conspiracy supported a single conspiracy theory for finding of guilt but multiple conspiracies as long as a single conspiracy could be concluded to exist.

Based on this instruction, the jury could disagree as to which conspiracy formed the basis of the single conspiracy for 500 grams or more of a mixture and substance containing methamphetamine that their finding of guilt was premises on as long as they agreed that a single conspiracy formed the basis of their opinion regardless of which conspiracy they based their finding of guilt on.

Each juror could find a separate conspiracy formed the basis of his or her finding of guilt. For instance, **Jurors 1 thru 5** could have establish that the single conspiracy between Ortiz, Panteleon, Narez, and Ronsberg was the basis of their finding of guilt while **Jurors 6 thru 8** used the single conspiracy between Ortiz, Maldonado, Rubin, Bryan, Sandquist, Dale and Reiners as the basis for their finding of guilt and still yet, **Jurors 9 thru 12** could have established guilt by the single conspiracy between Ortiz, and Call. Because the Court never instructed on the Wharton Rule and how it applies, if any of the jurors formed their opinion on the conspiracy between Ortiz and Call, the conviction would be unconstitutional.

The court allowed the jury to conclude that they unanimously agreed that a single conspiracy formed the basis of guilt without any proof that the jury agreed on the same conspiracy as forming the basis of their finding of guilt. As such, the jury could have been deadlocked but based on the confusing instruction, unable to present a deadlock issue to the

court. Counsel for defendant was clearly ineffective for not arguing the anti-deadlock instruction be given by the Court.

**ISSUE FOUR:**

**COUNSEL WAS INEFFECTIVE FOR NOT ARGUING THAT THE "INTENT" WAS NOT SHOWN REGARDING PETITIONER'S "POSSESSION" OF THE CONTROLLED SUBSTANCE.**

The "knowingly" and "intentionally" language in § 841(a) refers to the possessor's awareness that he is in possession of a controlled substance and not to his intention to distribute the substance sometime in the future. Section 841(a)(1) requires both general criminal intent and the specific 'intent to distribute" before a violation is proven. See United States v. Clark, 475 F.2d at 248. As the Ninth circuit correctly stated in United States v. Jewell, 532 F.2d 697, 698(9th Cir. 1976), 21 U.S.C. § 841(a)(1) "is violated only if possession is accompanied both by knowledge of the nature of the act and also by the intent 'to distribute, or dispense.'"

Similarly, although evidence of trafficking is of course admissible to prove that the accused intended to distribute the narcotics found in his possession, if the Government fails to allege or to prove such an intent the question of trafficking becomes irrelevant.

It should be noted that methamphetamine is not considered a narcotic drug and certain forms of the substance arguably do not fall under the control substance category. Section 2D2.1 explains under the application notes: The typical case addressed by this guideline involves possession of a controlled substance by the defendant for the defendant's own consumption.

Where the circumstances establish intended consumption by a person other than the defendant, an upward departure may be warranted. There was clear evidence that the substance being alleged as distributed in 2005 was for consumption by the parties involved. See (Tr. 148 n.

13-25). Evidence of consumption may have lead to an enhanced finding under the possession prong of 2D2.1 but clearly could not have lead to a conviction for conspiracy to distribute.

The basic question of criminal responsibility under the addiction defense is a legal, and not a purely medical, determination.

Not all drug users are "addicts" and, as with any compulsion, the degree of dependence may vary among different individuals and, indeed, even in a given individual at different stages of his addiction. Thus, what we are concerned with here is not an abstract medical or psychiatric definition of addiction, which sets forth a clinical checklist of relevant symptoms but, rather, a behavioral model, based upon traditional legal and moral principles, which tests the ability of the defendant to control his behavior.

The essential inquiry, then, is simply whether, at the time of the offense, the defendant, as a result of his repeated use of narcotics, lacked substantial capacity to conform his conduct to the requirements of the law. This test of addiction is adapted from the standard for the insanity defense announced by D.C. Circuit Court in United States v. Brawner, 153 U.S. App. D.C. 1, 471 F.2d 969(1972)(en banc) at 185.

In pertinent part, that decision declares that a defendant must be acquitted on the ground of insanity "if, at the time of the criminal conduct, the defendant, as a result of mental disease or defect, either lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct." The reasons for the technical modifications of this standard, such as substitution of "his repeated use of narcotics" in place of "mental disease or defect," are obvious in light of the differences between addiction and insanity.

The one major change is the deletion of the phrase "or lacked substantial capacity to appreciate the wrongfulness of his conduct." This alteration is due to the fact that the addiction defense focuses, as it should, on the volitional rather than the cognitive aspect of incapacity. If an addict has suffered a substantial impairment of his cognitive faculties, this would invariably be reflected in a recognized "mental disease or defect."

A movant who seeks to raise this issue as an affirmative defense at trial or during a plea hearing should bear the burden of going forward with some evidence of addiction. If the prosecution disputes this evidence, it should then bear the burden of persuasion beyond a reasonable doubt. In order to prove possession with intent to distribute, the government was required to show that Ortiz "(1) knowingly, (2) possessed the [methamphetamine] with intent to distribute it." To prove simple possession, the government was required to show that Ortiz "knowingly possessed a controlled substance" without being "so authorized." Ortiz contends that all the government ever proved was that he knowingly possessed a controlled substance without being so authorized.

The sentencing guidelines define a "controlled substance offense" to include possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, and export, distribute, or dispense, as unlawful conduct that can be prosecuted under federal law. (U.S. Sentencing Guidelines Manual 4B1.2(b)). As defined, "controlled substance offense" does not include simple possession.

In all criminal prosecutions, the government must disclose exculpatory evidence to a petitioner if such evidence is "reasonably available." "Exculpatory evidence" is defined as all reasonably available evidence in the Government's possession or any evidence that tends to

materially undermine the evidence that the Government intends to rely on in its case-in-chief, including any evidence or information that undercuts the reliability and/or credibility of the Government's evidence (i.e., such as evidence that casts doubt on a speaker's credibility, evidence that undermines the reliability of a witness's identification of movant, or evidence that indicates a statement is unreliable because it is the product of abuse, torture, or mental or physical incapacity, as well as any material inconsistencies and statements). Finally, the government failed to prove Ortiz's possession was with "intent" to distribute which makes his jury finding of guilt constitutionally invalid. The charge of possession of methamphetamine with intent to distribute requires proof of (1) the possession and (2) the intent to distribute.

The Government must show that Ortiz willfully associated himself in some way with the criminal venture and that he participated in the distribution of the substance. The Government only showed Ortiz used a controlled substance and that his addiction lead to decision defined under unlawful conduct. See United States v. Valerio, 48 F.3d 58(1st Cir. 1995)(Insufficient evidence that the drugs were intended for distribution); United States v. Polk, 56 F.3d 613(5th Cir. 1995)(Use of the defendant's car and home were insufficient to show participation); United States v. Hunt, 129 F.3d 739(5th Cir. 1997)(There was insufficient evidence of an intent to distribute); and United States v. Bryce, 208 F.3d 346(2nd Cir.), cert. denied, 537 U.S. 884(2002)(Uncorroborated admissions were insufficient to establish possession or distribution).

Ortiz was never shown to be a distributor of any controlled substance and as such his conviction cannot be held as valid regarding a distribution count and Counsel for Ortiz was clearly ineffective for not arguing at the time of the criminal conduct, the defendant, as a result of mental disease or defect, either lacked substantial capacity to conform his conduct to the

requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his

conduct as a user of the substance he was alleged to have distribute.

**ISSUE FIVE:**

**SCIENTIFIC PROOF THAT THE SUBSTANCE ALLEGED AT TRIAL WAS A CONTROLLED SUBSTANCE TRIGGERING THE PROVISION OF THE STATUTE WAS NEVER PRESENTED TO SUPPORT THE JURORS FINDING OF GUILT**

In DePierre v. United States, 09-1533(June 9, 2011), the Supreme Court of the United

States determined that evidence may be insufficient as a matter of law to support the conviction

and/or sentence in cases such as Ortiz.

An open consideration of the Supreme Courts opinion suggest that: "circumstantial

evidence of a substance may not include evidence of physical appearance of the substance

involved in the crime; evidence that the substance produce the expected effects when sampled by

someone familiar with the illicit drug; evidence that the substance was used in the same manner

as the illicit drug; evidence that the substance was called by the name of the illicit drug by the

defendant or others in his presence; and evidence of a "dry conspiracy" (supported on testimony

only).

A fair reading of DePierre is that the government must establish the scientific

identification of a substance in order to "prove beyond a reasonable doubt" that the substance

alleged at trial is in fact a substance that violates the provisions of law under which it is charged.

Ortiz was charged with conspiracy to distribute 500 grams or more of a mixture and

substance containing methamphetamine and sentenced to a term of 188 months imprisonment.

Because the scientific identification of a substance can establish differencing degrees of

punishment under § 841(a)(1) based on the controlled substance and the substance classification,

DePierre compels that the identity of the substance be establish since it is an offense element as a matter of statutory interpretation.

During the trial in Ortiz's case the government presented witnesses to establish, that Ortiz was involved in the possession and distribution of a controlled substance. None of the witnesses presented were a chemist. In Ortiz's case, the chemist was not identified who performed the test on the substance alleged at trial.

There are several tests that can be performed on a substance in order to identify drug alkaloids. The first screening procedure is what is referred to as a color test. There are four-color tests, color tests can only show if drug alkaloids are present and are preliminary test. The First Color test is with a WATNER. It is done by adding a small portion of a substance to a chemical that gives off a Brown color showing the presents of Alkaloids. This test only shows that alkaloids are presents and cannot define the purity level of the substance to establish "actual amounts." Another test is called a MARCHI test. This test is for opium alkaloids like heroin, morphine, ect. Moreover, it has nothing to do with cocaine.

The Third and Fourth Test is a combination of cobalt disonate (ph) and stannous chloride. Cobalt disonate (ph) is added into the material, it gives a blue color, and then stannous chloride is added into the mixture. If the blue color doesn't disappear, it's an indication that methamphetamine is present.

After completion of these color tests, a crystal test can be preformed. A crystal test is done under microscope, a small amount of the sampie is taken and platina chloride is added into it and the formation of methamphetamine crystals is observed. None of these tests can

19

differentiate between methamphetamine and ICE nor can they define the purity level for determination of actual substance.

The next procedure usually performed is a gas chromatography or separation process. The gas chromatography test is defined as "Dissolving a portion of the sample in alcohol and then shooting it onto a column which is contained in a heated oven with a syringe or needle, and the components of the mixture are separated out based on their boiling points of temperature for the oven.

As should be noted, the "gas chromatography and mass spectrometer equipment will only define if the substance is Methamphetamine, versus Heroin, THC, LSD, Oxycodone, PCP, Procaine, MDEA, MDMA, MDA, cocaine, or Amphetamine. The only test that can differentiate between Methamphetamine and ICE and will define the purity level is the FTIR or Fourier Transform Infrared Spectroscopy Test. Because this test was not shown to have been performed in Ortiz case it cannot be determined that the purity levels established in the laboratory reports submitted to this court are based on actual findings of facts and not hypothetical finding of Methamphetamine.

In addition, the Officers' that gave statements and defined the substance as a "controlled substance" were not trained in the field of chemistry nor gave any testimony regarding training in the field of chemistry so they could not give the court and informed opinion regarding the scientific identification of a substance.

DePierre holds a chemical laboratory specializing in drug analysis can easily distinguish the difference between Methamphetamine and ICE. See United States v. Jackson, 968 F.2d 158,

162(2nd Cir. 1991)("District Judges are forced to rely on the expert testimony of Chemist who Specialize in drug analysis in order to determine the identity of a substance".)Id.

Because most chemist are trained in performing what is defined as Wet chemistry, (using reagents, like the ones described in color test), it cannot be concluded that a proper test was conducted. There is also no evidence that the chemist who's listed on the lab reports performed any of the instrumental analysis to determine the "purity level of the substance for actual amount verification or that s/he was trained in instrumental analysis. There are several instruments that are used in a lab, the (GCMS) or Gas Chromatography Mass Spectrometry and the FTIR.

Because Methamphetamine and ICE have different chemical structures, different melting points and different solubility levels it takes instrumental testing (FTIR) to discern the difference between the two substances as well as establish the purity level for actual substance determination.

To perform a proper (FTIR) test a sample of the product is placed in the instrument and a beam of light in the infrared range is bombarding the sample and the sample will absorb light and what happens is based on the different fragments that are in the sample, they will actually absorb the light and the ultimate or the final product is a spectral that is generated. The FTIR correlates the sample spectral with the standard spectral that is in a library in the FTIR.

Substances submitted by the Laboratory establish the standard spectral and that sample is compared with the submitted evidence substance to compare the chart levels with the standards that are in the library.  The Chart generated by the FTIR shows a comparison of the tested sample with the library sample by comparing the amphetamine, to the salt to determine Methamphetamine, and the high levels on the chart would indicate whether the substance was

Methamphetamine or ICE. Methamphetamine gives an additional peak on the sample chart depending on the purity of the Methamphetamine submitted.

Because these chart readings, and sample testing require training in use of the equipment, Officers' and ATF Agents cannot be defined as chemist specializing in drug analysis, nor can they be considered "expert testimony," regarding the chemical makeup of the substance alleged in Ortiz's indictment. In addition, because the Chemist listed never submitted testimony that s/he either performed the FTIR test or was trained in the use of the FTIR equipment s/he testimony cannot be defined as expert testimony in discerning the purity level of the Methamphetamine submitted as evidence on the report.

Ortiz states that at the time of his trial there was no chemist that testified that a FTIR scientific test was conducted to determine the substance was in the form of "Methamphetamine."

In addition, the Judge cannot by a preponderance theory find that the substance was "Methamphetamine." Because the scientific identification of a substance can establish differencing degrees of punishment under § 841(a)(1) based on the controlled substance and the substance classification, and due to the fact that a "fake" substance is charged under 841(a)(2), DePierre compels that the identity of the substance be establish by a chemist since it is an offense element as a matter of statutory interpretation.

In order to test the substance purity and determine the type of substance being analyzed, a lab tech. often grinds all of the substance together as one substance or as defined in lab terms they homogenize the sample and then weigh out the amount to be tested.

Once tested, the FTIR comparison chart gives a read out with chart peaks and quality match numbers. The standards in the computers library are set at 100 percent and depending on

22

the number given on the comparison chart the substance may or may not accurately reflect the presents of cocaine molecules. For example, a sample quality result below 80 percent would be defined as a "cutoff" amount or an inclusive finding of methamphetamine.

Since your Honor was not asked to consider the type and purity level of the substance involved in the case, but was only asked to consider Ortiz's "unlawful possession of the substance," Ortiz's finding of guilt is constitutionally invalid. If as in Bousley v. United States, 523 U.S. 614, 626(1998), Ortiz was under the mistaken impression that at the time of conviction, "neither he, nor his Counsel, nor the District Court correctly understood the essential elements of the crime with which he was charged" as those elements are clarified by later judicial decisions-then Ortiz's entry of guilty is "constitutionally invalid" under the Federal Constitution.

Furthermore, presentment of uncharged conduct to the judge or a jury for determination of guilt is an unconstitutional variance that requires dismissal of the indictment with prejudice. The government clearly submitted testimony of methamphetamine without any proof that the substance alleged was methamphetamine, and not a fake substance that was never charged.

Because a look alike substance is not charged in the indictment, it cannot be presented at the plea by the government or inferred to Your Honor for a finding of guilt beyond a reasonable doubt. An indictment has been constructively amended if the bases on which Your Honor or a jury may convict are expanded beyond those included in the indictment. See United States v. Blanchard, 542 F.3d 1133, 1143(7th Cir. 2008); United States v. Mitov, 460 F.3d 901, 906(7th Cir. 2006). Allowing conviction for an uncharged crime infringes a defendant's Fifth Amendment right to know the nature of the accusation and Sixth Amendment right to indictment by grand jury. See Stirone v. United States, 361 U.S. 212, 215-16(1960); United States v. Ratliff-

23

White, 493 F.3d 812, 819(7th Cir. 2007). Constructive amendment can occur if the prosecution, during its argument or presentation of the evidence, or the court, through the jury instructions, expands the grounds the jury can rely on to convict the defendant. See United States v. Baker, 227 F.3d at 960.

Because the Supreme Court has established that, the scientific make up of a controlled substance is an element of the offense as a matter of statutory interpretation that must be **Proven Beyond A Reasonable Doubt**, in a plea hearing or jury trial. Ortiz asks that this court vacate the conviction and sentence with prejudice.

In sum, the well settled case law prior to DePierre, (i.e. "A violation of section § 841(a) occurs when the government proved beyond a reasonable doubt that a defendant possessed and intended to distribute a 'controlled substance' regardless of whether that substance is [Methamphetamine], [look alike substance] or [ICE]") See e.g. United States v. Williams, 876 F.2d 1521, 1525(11th Cir. 1989)(alteration in original), was implicitly and explicitly overruled by DePierre.

## CONCLUSION

WHEREFORE in light of the above arguments and holdings the Movant Guillermo Ortiz respectfully request that his section 2255 motion for relief be sustained and he be granted the requested relief by having his conviction and sentence vacated, set aside, and/or remanded in accordance with the laws of the United States.

Respectfully Submitted

*Guillermo·Ortiz*
Guillermo Ortiz
10757-173

# CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this MEMORANDUM IN SUPPORT OF 2255 RELIEF was placed in the inmate mail to be delivered through the United States Postal Service, postage prepaid, to the following parties: ASUA John Haak, Post Office Box 2638, Sioux Falls, SD. 57101-2638 and The Clerk of The United States District Court, Southern Division of South Dakota, 400 South Phillips Avenue, Room 128, Sioux Falls, SD. 57104-6851 on this _14_ day of May 2012.

Respectfully Requested

*Guillermo Ortiz*
Guillermo Ortiz
10757-173
P.O. Box 4050
Pollock, LA. 71467

## Footnotes

1.  **National Federation of Federal Employees v. Carlucci**, 680 F.Supp. 416 (D.C. Dist. Ct. 1998). (Before testing of a controlled substance can be submitted as evidence in a case, the government must establish that the substance was tested by a lab in compliance with federal standards. The guidelines also regulate the laboratories where testing is conducted. First, each lab must be certified to perform [] testing. See 3.1 et seq. Chain-of-custody, storage, and security measures are specified. 2.4(a)-(c). All samples are first subjected to immunoassay screening, 2.4(e), and any positive results are then confirmed by means of a gas chromatography/mass spectrometry test 2.4(f). Specimens are checked for five drugs: marijuana, cocaine, opiates, amphetamines, and phencyclidine. See Appendix B to Pls. Ex. A.

2.  The gas chromatography/mass spectrometry, allows chemists to "separate the components in a mixture and identify the chemicals in them based upon their mass spectrum. United States v. Diaz, 2006 U.S. Dist. LEXIS 91068 (9th Dist. 2006) (The two main types of instrumentation are Gas Chromatography Mass Spectrometry ("GCMS"), which can be used to identify cocaine and marijuana, and Fourier Transform Infrared Spectroscopy ("FTIR"), which can be used to identify cocaine hydrochloride and cocaine base.

3.  In United States v. Monroe, 978 F.2d 433 (8th Cir. 1992) the Appellate Court remanded the sentence for reconsideration because the district court applied the wrong proof standard and the chemist's evidence supporting the crack sentence was equivocal. The court could not say the substance was more likely than not crack cocaine.

4.     In the <u>United States v. Turner</u>, 591 F.3d 928 (7th Cir. 2009) Block an expert witness for the government explained how suspected substances are tested through gas chromatography, mass spectrometry, and infrared spectroscopy to generate graph data in order to determine the type of drug involved: The gas chromatography will print out a set of peaks that would be indicative of the presence of a drug or a standard that is run on that instrument for comparison purposes. The mass spectrometer will print out a spectrum for a drug that has been extracted. This is a specific test. By specific, it means the results that are generated are unique to that drug and no others. Likewise, the spectrum that is produced in the infrared spectroscopy will generate a spectrum, and again, this is the second specific test, the results, or which are specific to each and every individual drug.

5.     Benson's tests included a color test, which indicated positive for the possible presence of cocaine in the form of cocaine base. Benson then conducted a gas chromatography, mass spectrometry test ("GCMS). The GCMS is a confirmatory test. The GCMS test indicates the presence of cocaine but cannot determine whether cocaine powder or cocaine base is present. See United States v. Ayala, 2008 U.S. Dist. LEXIS 29288 (7th Dist. 2008).

6.     In Carlucci, Lieutenant Colonel John S. Jewell, who holds a Ph.D. in organic chemistry and served as consultant to the Surgeon General of the Army for drug laboratory operations, said "The RIA procedure (Abuscreen) is based on a physical reaction between antibodies (substances manufactured in the bodies of animals or humans to assist the bodies' elimination and/or detoxification of these substances) and antigens (drugs) that causes physical separation of these substances form urine. ... The RIA procedure correctly identifies the presence of drug or drug metabolites greater than 99% of the time. [] The GC/MS procedure combines both the physical and chemical properties of the molecule to be identified with the analytical capabilities of the instrument. The first part of the procedure relies on the physical and chemical properties of the drug or drug metabolite to separate them from the [] matrix. Then the drug or drug metabolite is usually taken through a chemical derivatization that makes use of the chemical properties of the compound to separate it from other molecules of different chemical structure. Then the derivative drug or drug metabolite of interest is separated from all other molecules by is physical properties using gas chromatography and an absolute identification is made through a mass spectrometer fragmentation pattern. This procedure is recognized as the state-of-the-art method and is 100% accurate for chemical, drug, or drug metabolite identification. Id at 428.

7.     In <u>United States v. Law</u>, 528 F.3d 888 (D.C. Cir. 2008), Waninger an FBI Chemist, testified that the "Gas chromatography/mass spectrometry," allows chemist to 'separate the components in a mixture and identify the chemicals in them based upon their mass spectrum." She stated for forensic chemists to detect [specific] controlled substances use that infrared spectroscopy, a test that passes infrared light through a sample to determine its unique chemical spectra, is needed.... Id at 295